664 S.E.2d 751

**Theresa D. MESSER, Plaintiff Below, Appellant**

v.

**HUNTINGTON ANESTHESIA GROUP, INC.; Dr. Farouk Abadir; Dr. Hosny S. Gabriel; Dr. Mark Newfeld; Dr. Ricardo Ramos; Dr. Alfredo Rivas; Dr. D. Grant Shy; Dr. Stanislav Striz; and Dr. Michael Vega, Defendants Below, Appellees.**

No. 33663.

Supreme Court of Appeals of West Virginia.

Submitted March 12, 2008.

Decided June 26, 2008.

Walt Auvil, Rusen & Auvil, PLLC, Parkersburg, for Appellant.

William D. Levine, Huntington, for Appellees, Huntington Anesthesia Group, Inc.; Dr. Farouk Abadir; Dr. Hosny S. Gabriel; Dr. Alfredo Rivas; Dr. Ricardo Ramos; and Dr. Michael Vega.

Thomas E. Scarr, Michael E. Estep, Jenkins Fenstermaker, PLLC, Huntington, for Appellees, Dr. Mark Newfeld; Dr. D. Grant Shy; and Dr. Stanislav Striz.

PER CURIAM:

This case is before us on appeal for a second time. In the first appeal (hereinafter "*Messer I* "),[1] we reversed the dismissal by

---

**1.** *See Messer v. Huntington Anesthesia Group, Inc.*, 218 W.Va. 4, 620 S.E.2d 144 (2005) (holding that the exclusivity provision of the Workers' Compensation Act does not preclude an employee's discrimination claim against an employer "[t]o the extent a worker's injuries are directly

the lower court of Theresa D. Messer's discrimination suit based on handicap. Ms. Messer (hereinafter "Appellant") now appeals from the January 11, 2007, order of the Circuit Court of Cabell County granting summary judgment to the defendants below. The defendants named in Appellant's suit are her previous employer, Huntington Anesthesia Group, Inc. (hereinafter "HAGI"), and the individual shareholder/physicians of HAGI, namely, Dr. Farouk Abadir, Dr. Hosny Gabriel, Dr. Mark Newfeld, Dr. Ricardo Ramos, Dr. Alfredo Rivas, Dr. D. Grant Shy, Dr. Stanislav Striz, and Dr. Michael Vega.[2]

In the present appeal, Appellant asserts three errors which occurred upon remand: the first regards the refusal of the lower court to enforce a settlement agreement she alleges was reached after the case was returned to the lower court; the second concerns the application of our holding in *Messer I;* and the third involves ex parte communications. We will limit our discussion in this case to the sole issue of the settlement agreement because our review of the record, briefs and arguments of counsel and the relevant law reveals that the court-annexed mediation resulted in a valid and enforceable settlement agreement. Therefore, the summary judgment order of the lower court is vacated and the case is remanded for entry of an order consistent with this opinion.

## I. Factual and Procedural Background

A full recitation of the facts of the underlying suit was set forth in *Messer I,* and we need only repeat here those facts which provide context to the matters under discussion. To further aid in understanding the facts in

light of the mediation, we note that the individual doctors named in Appellant's suit were shareholders in HAGI at the time of her employ and when her suit was filed. However, three of the doctors, Dr. Newfeld, Dr. Shy and Dr. Striz, severed their association with the corporation in 2004 with terms of that separation reputedly part of a settlement agreement that was reached among the doctors in September 2004.[3] Even though the three doctors retained separate counsel for advice regarding their interests under the 2004 settlement agreement, there is no question that the three doctors were represented in the instant case by the same legal counsel as the other named defendants.

Appellant filed suit in 2002 against HAGI and the eight doctors who were then shareholders in HAGI. Appellant, who had been employed as a certified registered nurse anesthetist by HAGI for over ten years, claimed that her employer failed to reasonably accommodate her physical limitations resulting from a back injury. The corporate and individual defendants named in Appellant's suit were represented by the same attorney, Mike Dellinger.

Upon remand of this case after our decision in *Messer I,* a status conference was held on April 13, 2006, at which the parties agreed to submit to court-annexed mediation.[4] Although the facts surrounding the mediation are largely disputed by the parties, no one contests that the parties mutually selected the mediator and the time and place for the May 18, 2006, mediation. The parties attending the mediation included Appellant, her attorney, Dr. Gabriel,[5] Dr. Ramos, Mr. Dellinger, and his co-counsel.[6] At

and proximately caused by the unlawful discriminatory acts of his or her employer, and are of a type not otherwise recoverable under the Workers' Compensation Act.") *Id.* at Syl. Pt. 4, 620 S.E.2d 144.

2. "Appellees" in this opinion will be used as a reference to all nine named defendants.

3. The 2004 settlement agreement was entered into evidence, but its terms are not directly at issue in the present appeal.

4. According to Mr. Dellinger's unrefuted testimony at the August 21, 2006, hearing on the motion to enforce the settlement agreement (hereinafter

"August 21 hearing"), Dr. Ramos had e-mailed Mr. Dellinger in February or March of 2006 indicating that the doctors wanted to initiate settlement of the case and stating a figure for an initial settlement offer.

5. Dr. Gabriel was president of HAGI at this time. It was explained at the hearing on the motion to enforce the judgment that Dr. Ramos attended the mediation to fill in while Dr. Gabriel was needed at the hospital that day.

6. Mr. Dellinger testified at the August 21 hearing that all eight of the doctors individually named in Appellant's suit were notified by letter of the

the conclusion of the mediation, the attending parties agreed to the proposal of the mediator which was reduced to a handwritten document. The handwritten agreement states that "[t]he parties agree that this handwritten document is a binding and enforceable contract to be replaced with a typewritten document and a full and complete release to be prepared by counsel for Defendants." The last two provisions in the handwritten agreement state as follows: ·

    7) The Defendants have not been able to reach all ~~physicians~~ partners that are party Defendants and this agreement will be held in abeyance for 3 weeks [7] pending unanimous approval of all ~~physicians~~ partners. If there is not approval by all within 3 weeks, there is no settlement and the matter may proceed to trial as if no settlement was reached.

    8) With unanimous consent of the partners to the settlement, the amount specified in paragraph 1 will be paid by June 30th, 2006.[8]

(Strike-outs in original; footnote added.). The document was signed by Appellant, Appellant's counsel, Dr. Gabriel and Mr. Dellinger.

It was established at the August 21 hearing that Mr. Dellinger sent a letter to Dr. Abadir, Dr. Vega and Dr. Rivas on June 2, 2006, relating that Mr. Dellinger had talked with the attorney for Drs. Newfeld, Shy and Striz, as well as another attorney some of the remaining doctors had asked to informally look at the settlement agreement.[9] According to Mr. Dellinger's testimony, the letter

outlined the issues facing HAGI and the doctors, and the need to communicate with Appellant about whether or not settlement was acceptable. Mr. Delligner said Dr. Ramos informed him by phone on June 5, 2006, that the letter had been discussed at a meeting he arranged with Drs. Abadir, Vega and Rivas. Mr. Dellinger learned during this phone call that the discussion at the meeting was heated at times, mostly due to Dr. Abadir not wanting to settle. Mr. Dellinger also testified he was told by Dr. Ramos that "ultimately all of the individuals agreed to the settlement and that I was authorized to communicate that to the other side."

Dr. Gabriel did not attend the June 3 meeting because he was out of the country on vacation, so following the meeting Dr. Ramos e-mailed Dr. Gabriel the following message:

    Hosny

    Today [S]aturday I meet with [Drs]. Rivas, Michael [Vega], Farouk [Abadir]. I discuss the problem with the [M]esser case and all ramifications of it. Michael said he has nothing to do with it because he was not a partner and that he signed something he . . . [is] not liable for anything, Farouk says he is not paying nothing, Rivas says he will go with what ever we decide. I am going to call our attorney on [M]onday and ask to see if we can delay this until the 16 which is [F]riday and see what happens. Farouk is saying let[']s go to court and fight but he doesn't knoew [sic] the ramification of an appeal etc etc.

---

time, place and date of the mediation and advised that they could attend. It was also established at the August 21 hearing that counsel for the three doctors who had left the corporation informed Mr. Dellinger that his clients did not oppose settlement of the case, but none of them would attend the mediation nor would they contribute to any monetary payment that may be part of a settlement.

7. Mr. Dellinger testified that since the corporate funds were not sufficient to satisfy the monetary portion of the agreement, the three-week period was inserted in the handwritten agreement in order to give Dr. Gabriel and Dr. Ramos time to explore financing and to allow the other doctors who were out of the country at the time "to decide whether or not they wanted to agree to the tentative settlement."

8. The amount specified in Paragraph 1 of the handwritten settlement agreement is $225,000. According to Mr. Dellinger's testimony, it was his understanding from Dr. Gabriel and Dr. Ramos that this amount was to be paid from corporate funds approximating $100,000 to $125,000 and individual physician contributions.

9. It was clarified at the August 21 hearing that Drs. Gabriel and Ramos had asked Mr. William D. Levine to review the proposed settlement. Mr. Levine was not representing any of the defendants at that time even though he succeeded Mr. Dellinger in representing the defendants after Mr. Dellinger withdrew from the case.

If you read this e-mail, write me back. Richard [Ramos].

Dr. Gabriel replied to Dr. Ramos by return e-mail on June 4, 2006, by stating:

I agree with you in settling the case and please let Rivas ask the bank if we can borrow $100,000 and let [L]inda call [M]r. [John] [P]erry [accountant] to ask him about the advantage of getting the money from the bank or to pay it from our pockets which ever advantage for us. Please don[']t listen to [F]arouk, he will pay he likes it or not. Now I have the internet connected and I will be in touch with you. Than[k]s. Hosny

Dr. Ramos' rendition of the information exchanged during the June 5 phone call is significantly different from the testimony of Mr. Dellinger. Dr. Ramos testified that he told Mr. Dellinger during that phone conversation that "we would like to settle and get it over with. We still have Dr. Abadir not agreeing to the settlement." Dr. Ramos went on to testify that "I told him [Mr. Dellinger] Dr. Abadir did not agree. We had a heated discussion on Saturday, but Hosny was going to work on him." When asked if he told Mr. Dellinger that Dr. Gabriel was going to try to get Dr. Abadir to change his mind, Dr. Ramos said he could not remember. He attributed his memory problems with his June 11, 2006, hospitalization for cardiac bypass surgery on June 15.

On June 6, 2006, Mr. Dellinger sent a letter to the mediator and Appellant's counsel reporting "that the settlement is now final as all partners have approved the terms agreed to by the parties at mediation." This letter further related that a typed settlement agreement, release and dismissal order would be forwarded to Appellant's counsel in the near future. Finally, it was indicated in the letter that Mr. Dellinger was planning to contact the presiding judge in the case to advise him that the case had settled pending execution of the documents, and that the scheduled June 14, 2006, hearing regarding Appellant's motion to compel discovery [10] was no longer needed. According to Mr. Delling-

er, a blind copy of the June 6 letter was sent to HAGI and the individual doctors.

Appellant was notified by her counsel of the settlement. Mr. Dellinger forwarded a "Confidential Settlement Agreement and Release of All Claims" and a dismissal order to Appellant's counsel by e-mail dated June 8, 2006, which also appeared in the form of conventional written correspondence dated June 9, 2006. Copies of the June 9 letter were sent to all Appellees.

Changes in the draft agreement were negotiated between counsel for each side and a copy of the document was signed by Appellant and notarized on June 12, 2006. A copy of the signed document was then sent to Mr. Dellinger. By e-mail dated June 13, 2006, Mr. Dellinger requested one final change on behalf of his clients. The change was agreed to in a subsequent phone call between the attorneys that day. During his testimony, Mr. Dellinger indicated that between June 6, 2006, and June 13, 2006, he was not contacted by any of the individual doctors as to any confusion or misunderstanding about their acceptance of the settlement.

Mr. Dellinger notified the doctors by letter dated June 13, 2006, that he had received the confidential settlement agreement signed by Appellant. In this communication Mr. Dellinger told the doctors that "[t]he revisions [made to the agreement handwritten by the mediator] were acceptable and consistent with the agreement reached by the parties at mediation." The letter thereafter related the need for the doctors to meet to sign and execute the contract and set forth a time frame within which the checks had to be written in order to conclude the settlement by the June 30, 2006, date fixed in the agreement.

Mr. Dellinger testified that he first learned that the doctors were not going to abide by the settlement agreement on June 15, 2006, when he read the e-mail Dr. Gabriel had sent to him near midnight the day before. During his testimony Mr. Dellinger said that the substance of this e-mail message was that Dr. Abadir was against the settlement, Dr. Ramos was undergoing a surgical procedure

---

**10.** The motion to compel was filed to resolve the repeated failure of HAGI to respond to Appel-

lant's deposition notices pursuant to Rule 30(b)(7) of the Rules of Civil Procedure.

the following day, and from HAGI's point of view the entire settlement was on hold.

Mr. Dellinger called Dr. Gabriel after reading the e-mail. Mr. Dellinger said that during the phone call he expressed his surprise that the settlement was not going forward, and reiterated what Dr. Ramos had said on the phone about the other HAGI affiliated doctors agreeing to settlement and authorizing Mr. Dellinger to contact Appellant. Mr. Dellinger testified that Dr. Gabriel in effect responded by saying "I know, but Dr. Abideer's [sic] against the settlement. And we haven't signed anything, and from our point of view, you know, the settlement is not going through." Mr. Dellinger added that he recalled that Dr. Gabriel also related some difficulty in obtaining financing and that Dr. Ramos had changed his mind about settlement. Mr. Dellinger further stated that this was the only communication he had with any of the doctors in response to the June 6 letter confirming settlement.

Throughout Dr. Abadir's testimony at the August 21 hearing he said that he never agreed to settle. On cross-examination, Dr. Abadir agreed that when he said he was not willing to settle he meant that he was not willing to contribute either his personal funds or the funds he believed he was entitled to from HAGI towards the settlement.

Dr. Abadir stated throughout his testimony that he did not read the mail he received from Mr. Dellinger. However, he admitted to reading the June 6, 2007, letter confirming settlement because it came shortly after the June 3, 2007, meeting of the doctors. Dr. Abadir said that when he received the letter he called Dr. Ramos rather than Mr. Dellinger because Dr. Ramos had arranged the June 3 meeting. Dr. Abadir also testified that he was aware Mr. Dellinger was the lawyer representing the corporation and the eight doctors named in Appellant's suit, but Dr. Abadir never spoke with Mr. Dellinger about the settlement agreement or any other matter related to the case.

By correspondence dated July 3, 2006, Mr. Dellinger informed Appellant through her counsel that the doctors were "not going through with the proposed settlement reached at mediation on May 18, 2006." Mr. Dellinger's letter also stated that he was withdrawing as counsel in the case and indicated that other counsel would be substituted. Thereafter Appellant moved to enforce the settlement agreement, and a hearing on the motion was held on August 21, 2006. At the conclusion of the hearing the lower court directed counsel to submit proposed findings of fact and conclusions of law as quickly as possible, and the trial judge said that he would try to issue his ruling within a week.[11] It appears that the judge also indicated that the submissions of counsel did not have to be served on opposing counsel. By order dated September 21, 2006, the lower court denied the motion to enforce the settlement agreement based on the finding that Mr. Dellinger "did not receive from his clients the authorization to settle this case."

A status conference was held in November 2006, at which the parties advised the lower court that the case was ready for trial. The schedule agreed upon at the status conference was formalized in a December 11, 2006, order, which stated the trial date of February 12, 2007, the pre-trial conference date of February 2, 2007, and the date by which dispositive motions were to be filed as December 15, 2006.

On December 15, 2006, HAGI and the individual doctors filed motions to dismiss and/or for summary judgment. The hearing on the motions was set for January 4, 2007. Appellant filed an initial response to the motions on December 29, 2006,[12] in which she reminded the lower court that defense had failed to comply with the deposition ordered by the court in April 2006. The response indicated that the evaluation of the motions for summary judgment would be inappropriate until after the Rule 30(b)(7) discovery was completed on the rescheduled date of

---

11. Appellant did not submit proposed findings of facts and conclusions of law because her counsel had ordered a transcript of the hearing which was not received until September 25, 2006, after the order was entered.

12. Appellant filed a more complete response to the motions for summary judgment on January 4, 2007.

January 16, 2007.[13] Thereafter on January 3, 2007, Appellees filed a "Motion to Quash Notices of Deposition." In support of the motion to quash, Appellees asserted that discovery was ordered to be completed by October 31, 2006, Appellant did not voice intent to take depositions subsequent to that date at the November status conference and the schedule for deposition was excessively burdensome because of the proximity to trial.[14]

The hearing on the motions for summary judgment was conducted on January 4, 2007. At the conclusion of the arguments, the lower court directed counsel for the respective parties to submit by January 9, 2007, proposed findings of fact and conclusions of law without serving the same on other counsel. By order dated January 11, 2007, the lower court granted Appellees' motions for summary judgment.

According to Appellant's counsel, it was not until January 15, 2007, during a phone call with another lawyer in the case that he realized proposed findings of fact and conclusions of law along with draft orders were directed by the court to be submitted without service of the same on counsel for all parties. Based upon this knowledge, Appellant filed a "Motion to Determine Scope and Nature of Ex Parte Contacts" on January 29, 2007. Following a hearing, the lower court denied the motion by order dated March 14, 2007, because "[p]roper discovery of the alleged ex parte communications is to file a Judicial Complaint against this Judge."

Appellant filed her petition for appeal of the summary judgment order with this Court on May 11, 2007, and review was granted by order dated October 24, 2007.

## II. Standard of Review

This case presents questions related to a circuit court's rulings on three diverse issues to which different standards of review apply. However, as we find the settlement agreement issue to be dispositive, it is unnecessary to recite review standards for matters we will not consider further in this opinion.

Some of the Appellees maintain that the deferential standard of review followed in *DeVane v. Kennedy*, 205 W.Va. 519, 519 S.E.2d 622 (1999), to review a lower court's order enforcing a settlement agreement is equally appropriate to the case at hand. This suggestion overlooks the reasons driving the application of the abuse of discretion standard in such cases. As explained in *DeVane*, "[t]he reason for this deferential standard is that '[b]oth law and equity favor repose of litigious matters. Compromise by parties of their differences is favored by all courts. When a matter has thus been put at rest, it should not be disturbed except for grave cause.' *Sanders v. Roselawn Mem'l Gardens*, 152 W.Va. 91, 104, 159 S.E.2d 784, 792–93 (1968)." (Citation omitted). 205 W.Va. at 527, 519 S.E.2d at 630.

Without such compelling considerations, our review of lower court decisions is approached with three standards in mind. These standards are summarized in syllabus point two of *Walker v. West Virginia Ethics Commission*, 201 W.Va. 108, 492 S.E.2d 167 (1997), in the following way:

> In reviewing challenges to the findings and conclusions of the circuit court, we apply a two-prong deferential standard of review. We review the final order and the ultimate disposition under an abuse of discretion standard, and we review the circuit court's underlying factual findings under a clearly erroneous standard. Questions of law are subject to a *de novo* review.

We further elaborated on this general review process in syllabus point one of *State ex rel. Cooper v. Caperton*, 196 W.Va. 208, 470 S.E.2d 162 (1996), by stating that "findings of fact are reviewed for clear error and conclusions of law are reviewed *de novo*. However, ostensible findings of fact, which entail the application of law or constitute legal judgments which transcend ordinary factual determinations, must be reviewed *de novo*."

---

13. Appellant had moved to compel discovery ordered by the court around the time that the settlement agreement was being negotiated. *See* n. 10, *supra*.

14. The motion to quash was denied by order dated March 14, 2007, as being improperly noticed.

We proceed in applying these standards to our study of the matters raised in the case sub judice.

## III. Discussion

Appellant maintains that the lower court erred by refusing to enforce the settlement agreement on the grounds that Mr. Dellinger lacked the authority to bind Appellees. In support of the lower court's ruling, Appellees maintain that there was no enforceable settlement agreement because there was no meeting of the minds, and Mr. Dellinger had never been authorized to make the representation that all of the doctors had approved the settlement agreement.

■■■ As summarized in *Triad Energy Corp. of West Virginia, Inc. v. Renner*, 215 W.Va. 573, 576, 600 S.E.2d 285, 288 (2004),

[t]he meeting of the minds requirement has been recognized by this Court as specifically applicable to settlement agreements.... In *O'Connor v. GCC Beverages*, 182 W.Va. 689, 691, 391 S.E.2d 379, 381 (1990), this Court stated: "It is well understood that '[s]ince a compromise and settlement is contractual in nature, a definite meeting of the minds of the parties is essential to a valid compromise, since a settlement cannot be predicated on equivocal actions of the parties.' 15A C.J.S. *Compromise & Settlement*, sec. 7(1)(1967)."

(Some internal citations omitted). The contractual concept of "meeting of the minds" or "mutual assent" relates to the parties having the same understanding of the terms of the agreement reached. *See* 17 C.J.S. *Contracts* § 35 (1999). In the instant case, the substantive terms of the settlement agreement drawn by Mr. Dellinger closely parallel those in the handwritten agreement developed at mediation. These terms included the gross payment of $225,000 by the defendants no later than June 30, 2006, in return for the general release from liability and dismissal of all claims with prejudice by the plaintiff. The record is devoid of evidence suggesting that modifications to the substantive terms of the agreement were made by any of the parties. Actually, the dispute which arose among the doctors was not with the terms of

the agreement but rather with how the terms of the agreement would be fulfilled. The sole pivotal issue before us then is whether, in the absence of express authority, the Appellees' attorney had the apparent authority to obligate the doctors and HAGI to the terms of the settlement agreement.

■■■ This Court addressed the concept of apparent authority in *General Electric Credit Corporation v. Fields*, 148 W.Va. 176, 133 S.E.2d 780 (1963), observing that authority to do a particular act may be inferred. *Id.* at 181, 133 S.E.2d at 783. Furthermore, we held in this case that

[o]ne who by his acts or conduct has permitted another to act apparently or ostensibly as his agent, to the injury of a third person who has dealt with the apparent or ostensible agent in good faith and in the exercise of reasonable prudence, is estopped to deny the agency relationship.

*Id.* at Syl. Pt. 1, 133 S.E.2d 780. Evidence supporting the existence of apparent authority includes " 'statements, conduct, lack of ordinary care, or other manifestations of the principal's consent.' " *Clint Hurt & Assoc., v. Rare Earth Energy*, 198 W.Va. 320, 327, 480 S.E.2d 529, 536 (1996).

■■■ When an attorney-client relationship exists, apparent authority of the attorney to represent his client is presumed. Syl. Pt. 1, *Miranosky v. Parson*, 152 W.Va. 241, 161 S.E.2d 665 (1968). We addressed the significance of this presumption of apparent authority with regard to settlement agreements in *Sanson v. Brandywine Homes, Inc.*, 215 W.Va. 307, 599 S.E.2d 730 (2004). The *Sanson* plaintiffs alleged on appeal that their attorney had reached the settlement with the corporate defendant without their authorization. Although accepting the position of the plaintiffs, the decision to enforce the settlement agreement was upheld based upon the following reasoning:

While this Court has recognized that "[t]he mere relation of attorney and client does not clothe the attorney with implied authority to compromise a claim of the client," Syllabus Point 5, *Dwight v. Hazlett*, 107 W.Va. 192, 147 S.E. 877 (1929), we have also held that "[w]hen an attorney appears in court representing clients there

is a strong presumption of his authority to represent such clients, and the burden is upon the party denying the authority to clearly show the want of authority." Syllabus Point 1, *Miranosky v. Parson,* 152 W.Va. 241, 161 S.E.2d 665 (1968).

215 W.Va. at 312, 599 S.E.2d at 735.

■ In the order denying the enforcement of the settlement agreement in the instant case, no mention is made of the strong presumption of authority raised by Mr. Dellinger being the recognized attorney for all named defendants or the heightened burden Appellees bore in order to rebut the presumption. After close examination of the record before us in light of this legal standard, we are obliged to conclude that Appellees failed to meet their burden of clearly showing a want of authority in this case.

It is clear from the record that the three doctors who terminated their association with HAGI in 2004 did not object to the settlement because they believed they had no responsibility to make any financial contribution under the terms of their 2004 separation agreement.

The record also supports the conclusion that Dr. Ramos served as the conduit of information if not the spokesperson between the doctors who retained affiliation with HAGI and Mr. Dellinger. Before the case was ordered to mediation, Dr. Ramos had sent an e-mail to Mr. Dellinger saying that the doctors wanted to initiate settlement and he proposed an initial settlement offer. He attended the mediation, organized a meeting with the doctors about the terms of the handwritten mediation agreement, kept Dr. Gabriel apprised of settlement developments even while Dr. Gabriel was traveling abroad, routinely communicated information regarding the settlement to Mr. Dellinger by phone and e-mail, and fielded questions from the HAGI doctors. In like fashion, the HAGI doctors recognized him as their spokesperson by contacting him directly when they had concerns with the settlement agreement. An example of this recognition is Dr. Abadir's testimony that while he understood that Mr. Dellinger was the attorney in the case, he called Dr. Ramos with the concerns he had about the division of responsibility for payment of the figure stated in the settlement agreement. Actually, the only other individual who directly contacted Mr. Dellinger was Dr. Gabriel, who represented HAGI as its president. Moreover, none of the HAGI affiliated doctors contacted Mr. Dellinger immediately upon receipt of the June 6 letter announcing the doctors' acceptance of the settlement to, at the very least, question Mr. Dellinger's authority to make such a move on their behalf. It was not until near midnight on June 14 that Dr. Gabriel sent an e-mail to Mr. Dellinger telling him that the HAGI doctors were opposing the settlement. Viewed as a whole, the statements and conduct of the doctors form clear supportive evidence that Mr. Dellinger's reliance on Dr. Ramos' representations was reasonable under the circumstances.

It is true that Dr. Ramos testified that Mr. Dellinger misconstrued what Dr. Ramos told him during the June 5 phone conversation regarding agreement among the HAGI doctors. However, Mr. Dellinger's account of the content of that phone call is corroborated by the e-mail Dr. Gabriel sent to Dr. Ramos on June 4, the day before Dr. Ramos called Mr. Dellinger to inform him about the June 3 meeting of the doctors who remained affiliated with HAGI. The actual contents of the electronic communications about the June 3 meeting bear repeating.

June 3, 2006, e-mail of Dr. Ramos to Dr. Gabriel:

Hosny

Today [S]aturday I meet with [Drs]. Rivas, Michael [Vega], Farouk [Abadir]. I discuss the problem with the [M]esser case and all ramifications of it. Michael said he has nothing to do with it because he was not a partner and that he signed something he ... [is] not liable for anything, Farouk says he is not paying nothing, Rivas says he will go with what ever we decide. I am going to call our attorney on [M]onday and ask to see if we can delay this until the 16 which is [F]riday and see what happens. Farouk is saying let[']s go to court and fight but he doesn't knoew [sic] the ramification of an appeal etc etc. If you read this e-mail, write me back. Richard [Ramos].

June 4, 2006, reply e-mail of Dr. Gabriel to Dr. Ramos:

> I agree with you in settling the case and please let Rivas ask the bank if we can borrow $100,000 and let [L]inda call [M]r. [John] [P]erry [accountant] to ask him about the advantage of getting the money from the bank or to pay it from our pockets which ever advantage for us. Please don[']t listen to [F]arouk, he will pay [whether] he likes it or not. Now I have the internet connected and I will be in touch with you. Than[k]s. Hosny

The credibility of Dr. Ramos' testimony must also be weighed against the doctor's admission that his memory was not clear regarding the specifics of what actually was said during the June 5 phone call because of his subsequent cardiac surgery.

These facts simply do not establish the clear showing necessary to overcome the presumption of Mr. Dellinger's apparent authority to bind his clients to the settlement agreement. Appellant acted in good faith and exercised reasonable prudence in relying on the apparent authority of Mr. Dellinger, and by so doing is entitled to enforcement of the settlement agreement. Syl. Pt. 1, *General Electric Credit Corp. v. Fields*, 148 W.Va. at 176, 133 S.E.2d at 780. Accordingly, it was error for the lower court to deny Appellant's motion to enforce the settlement agreement, and that ruling can not stand.

■ Appellant further maintains that award of attorney's fees is warranted upon this Court finding the settlement agreement enforceable. We agree.

■ Litigants are normally responsible for paying their own attorney's fees unless court rule, statute or express contract provision provides otherwise. Syl. Pt. 2, *Sally–Mike Properties v. Yokum*, 179 W.Va. 48, 365 S.E.2d 246 (1986). However, "[t]here is authority in equity to award to the prevailing litigant his or her reasonable attorney's fees as 'costs' . . . when the losing party has acted in bad faith, vexatiously, wantonly or for oppressive reasons." *Id.* at Syl. Pt. 3, 365 S.E.2d 246. See Syl. Pt. 2, *Sally–Mike Properties v. Yokum*, 179 W.Va. 48, 365 S.E.2d 246 (1986).

As recognized by the lower court in the order denying the motion to enforce the judgment, "[i]t is undisputed that the Plaintiff and her Counsel were willing to discuss the issues and attempt to negotiate in good faith." Appellant was unaware of any dispute among the doctors regarding the settlement and accommodated Appellees logistical requests at all phases of the settlement process, including agreeing to allow additional time to finalize the settlement. Under these circumstances, Appellant "should not have to bear the financial burden caused by . . . [Appellees'] attempt to rescind a valid and enforceable settlement agreement." *Sanson*, 215 W.Va. at 312, 599 S.E.2d at 735.

### IV. Conclusion

Based upon the foregoing, the January 11, 2007, summary judgment order of the Circuit Court of Cabell County is vacated. The case is remanded for entry of an order enforcing the settlement agreement and awarding appropriate attorney's fees with respect to Appellant's efforts to enforce the settlement agreement in the trial court, before this Court and for any additional proceedings required other than proceedings necessary to ascertain reasonable attorney's fees.

Vacated and remanded.