383 S.E.2d 318

**Charles THOMAS, as President and on Behalf of the McDowell County Non-Teaching Employees Association, et al.**

v.

**BOARD OF EDUCATION OF McDOWELL COUNTY.**

**No. 18243.**

Supreme Court of Appeals of West Virginia.

July 21, 1989.

Lee H. Adler, Beckley, for Thomas.

Sidney H. Bell, APA, Welch, for Board of Educ. of McDowell Co.

PER CURIAM:

This case is before the Court upon the appeal of Charles Thomas, President of the McDowell County Non–Teaching Association (employees).[1] The Circuit Court of McDowell County, serving as the finder of fact, found that the appellee, the McDowell County Board of Education (the Board) did not breach a settlement contract it negotiated with the appellant. We reverse, since the appellees failed to prove that certain terminations were linked to decreases in federal funding, as required by the contract.

The dispute in this case surrounds settlement negotiations between the parties that resulted from this Court's decisions in *Thomas v. Board of Education of McDowell County*, 164 W.Va. 84, 261 S.E.2d 66 (1979) (*Thomas I*) and *Thomas v. Board of Education of McDowell County*, 167 W.Va. 911, 280 S.E.2d 816 (1981) (*Thomas II*). In these prior cases, the Court determined that the Board was improperly applying a bond levy and required the Board to apply the money toward the salaries of the nonteaching employees, pursuant to *W.Va. Code*, 18A–4–8 [1988] minimum pay scales.

Prior to outlining the pertinent events surrounding the settlement contract and the alleged breach by the Board, there are two important facts which should be noted. First, *W.Va. Code*, 18A–2–6 [1984], 18A–2–7 [1987], and 18A–2–2(1) [1988], require written notice and the right to a hearing for service personnel, such as those employees involved in this case, who have attained "continuing contract status" and are being terminated or transferred. Service personnel must receive notice of termination no later than April 1 for the subsequent school year in which they will be terminated. For example, continuing contract service personnel must be notified by April 1 of the year 1990, in order to be terminated at the end of school year 1990–1991. Second, the contested provisions of the contract were jointly written by the negotiators of the contract, Thomas and former McDowell County School Superintendent, John Drosick, deceased,[2] non-lawyers.

As previously indicated, in 1979, the Court held in *Thomas I* that the Board owed money to the employees when it failed to apply a bond levy to their salaries. However, the amount due the employees remained in litigation for another two years.

On April 1, 1981, the Board sent 37 employees termination notices.[3] Therefore, under the statutory notice requirements, at the end of the 1981–82 school year these 37 employees would be terminated.

On July 29, 1981, this Court rendered its second decision concerning the ongoing salary dispute in *Thomas II*. As a result of our decision, the McDowell County Circuit Court entered a judgment order against the Board for 1.28 million dollars, plus interest, which amounted to $200,000.

The employees and the Board immediately entered into settlement negotiations because both were aware that execution of the judgment could bankrupt the county school system.

The two negotiators *orally* agreed to a settlement on September 1, 1981.

Thomas agreed that the Board could pay the judgment in two allotments. The Board paid one-half of the 1.28 million dollars owed in September, 1981. The second payment was due in September, 1982. Thomas agreed to waive the $200,000 in

1. The Non–Teaching Association is composed of over 400 members, ranging from cooks and mechanics to teachers' aides.

2. During the 1981–82 school year, the time all pertinent events transpired, John Drosick served as Superintendent of the McDowell County school system and Bennett Church served as coordinator for federal funds. Drosick died prior to trial and was replaced by Bennett Church.

3. While the record is vague in respect to the job status of these employees, it appears as though three quarters of these 37 employees were teachers' aides. The 37 employees were notified by the Board on April 1, 1981 that they would be terminated at the end of the 1981–82 school year because of an alleged budget deficit of $577,000 experienced in the 1980–81 school year.

accrued prejudgment interest contained in the judgment order.

In exchange, the Board agreed to provisions 6 and 7 which read, in pertinent part:

(6) There will be no reduction in teaching or non-teaching personnel as a result of this judgment being satisfied out of monies or tax levies belonging to the Board of Education, provided, however, that the Board may make reductions in personnel where the Superintendent has proven that such reductions are linked:

(a) to cause[s] attributable to the individual employee, as provided by West Virginia Code # 18A–2–8,

(b) to loss of Federal funds,

(c) to loss of State funds.

(7) That non-teaching and teaching personnel reductions to meet the legislative requirements prescribing the number of employees per one thousand student enrollment is only to be accomplished through attrition, and that reduction in teaching and nonteaching personnel due to declining enrollment in the school system is only to be accomplished after the Board consults with representative of the Employees.

There was also a provision for the expiration of the contract upon payment of the second half of the judgment, due September, 1982.

The settlement contract was finalized in writing and signed by Mr. Thomas, on behalf of the employees, and Mr. Tony J. Romeo, president of the Board, on February 23, 1982.

Both signatories to the agreement, Thomas and Romeo, testified that these provisions were negotiated by Thomas for the benefit of the 37 employees who received the termination notices in April, 1981, that informed them that their employment would end at the conclusion of the 1981–82 school year.

Both Thomas and Romeo testified that with the inclusion of provision six in the settlement contract, and the provision concerning the expiration of the contract upon full payment of the settlement in September, 1982, the parties intended to, in effect, void the previous 37 termination notices and provide the 37 employees one more year of employment (the 1982–83 school year, unless any of the conditions contained in 6(a)(b)(c) occurred).

The parties explained that the contract stated that it did not expire until the second payment, September, 1982. Since the contract did not expire until September, 1982, the Board would have to provide termination notices for the 1982–83 school year by April 1, 1982. The parties understood the agreement to mean that the 37 employees who previously were sent termination notices for the end of the 1981–82 school year would be retained for one more year, the 1982–83 school year, unless the conditions contained in 6(a)(b) or (c) occurred.[4]

Within two weeks after the contract was signed, the Board met on March 9, 1982, and announced its intention to begin the proceedings to terminate the 37 employees who were previously notified on April 1, 1981 that their employment would cease at the conclusion of the 1981–82 school year. The notices were sent on March 10, 1982, and the reason for the termination was listed as "lack of seniority to retain position."[5]

The appellant filed a civil action alleging, among other things, that the Board breached the agreement because it did not (1) notify Thomas of its impending intentions to lay off the employees; and (2) prove the

---

4. The settlement contract never explicitly voided the 37 termination notices, which were scheduled to take effect at the end of school year 1981–82. However, both Thomas and Romeo understood the agreement as giving the 37 non-teaching employees one more year of employment. Counsel for the appellant has correctly, consistently noted both at the circuit court and before this Court that Thomas agreed to forbear the legal right to execute the judgment order, including the $200,000 in interest,

in exchange for the additional year of employment for the 37 employees. If provisions 6 and 7 are not read in such a manner, then Thomas received no consideration for the forbearance.

5. Bennett Church, federal funding coordinator during this period, subsequently testified that because of an alleged lack of federal funding, employees with less seniority were terminated. Discussed, *infra*.

terminations were attributable to an alleged loss of federal funding.

The appellees answer to the complaint was that "[t]here has been a reduction of $359,853 of Federal Funds which has necessitated the termination of 27 Federal teacher aide positions in the 1982–1983 schoolyear." It also noted the $577,000 deficit in the 1980–81 school year (the reason for the employees receipt of the initial termination notices of April, 1981 for school year 1981–82).

The case was tried before the Circuit Court of McDowell County. The appellant testified that he was never notified of the pending terminations and the Board never proved that the financial losses that allegedly triggered the 37 terminations were attributed to the lack of federal funds. He also testified, as did Board president Romeo, that this was a material term in the contract. Thomas testified that the additional year of employment for the 37 employees was the sole benefit the Non–Teaching Association received from its agreement to forego enforcement of the judgment order, which included the $200,000 in accrued interest. *See* note 4, *supra.*

Contrary to his deposition wherein Board president Romeo stated that the layoffs were due to the settlement,[6] Romeo testified that he did not know whether the termination of the 37 employees for the 1982–83 school year was linked to federal fund losses.

The current school superintendent, Bennett Church, who during 1981–82, served as coordinator for federal funds, testified regarding the losses.

■ He accounted for a $96,000 loss in federal funding (4%) for school year 1982–83. He was made aware of possible funding cuts just prior to the March 9, 1982 Board meeting.[7] Church testified that these funds were allocated from a federal program which specifically earmarks the money for teacher aide salaries. He also added that the Board had a surplus of these funds from the 1980–81 school year. According to Church, this surplus was the sole source from which the Board paid the 1.28 million dollar settlement to the employees. He also attributed the termination notices to the county's failure to comply with certain statutory ratios for such employees. (see provision 7 of the contract, *supra* ).

■ The trial judge concluded that the contract was not breached. The court's factual findings merely recite the evidence presented and therefore provide no assistance to this Court in understanding its reasoning. The court then flatly concluded that there was no breach of contract, without addressing the numerous contentions of the parties. Of equal importance is the trial judge's failure to address the burden of proof in this action, which remains contested on appeal.[8]

In syllabus point 1 of *Tomkies v. Tomkies,* 158 W.Va. 872, 215 S.E.2d 652 (1975), we held: "Failure to comply with the requirements of Rule 52(a), W.Va.R.C.P. au-

---

6. A motion for summary judgment was made by the appellant, Thomas, based on the Romeo deposition in which Board President Romeo fully admitted that the Board violated provision (6) of the contract by terminating the employees because of the settlement. The motion was denied.

7. The March 9, 1982 Board decision to terminate the 37 employees was based on Church's statement to the Board that he had been informed by certain federal funding coordinators that "there was a possibility at that time we had been told that the reduction could be as much as 15 per cent or as little as four per cent.... Now again that wasn't anything new, because it was yearly we would hear this reduction...."

Defendant offered into evidence a newspaper article, dated March 10, 1982 wherein the Board

announced the layoffs were the result of a $250,000 loss of federal funding. Given Church's testimony, we find no error in the trial judge's refusal to admit the newspaper article as evidence of the loss of federal funds.

8. At trial counsel for both parties contested which party was required to prove the loss of federal funding. The trial judge did not address the matter in his order and went on the record as refusing to address the matter during trial. The parties continue to dispute the issue on appeal. The contract unambiguously required the Board to prove the losses, regardless of whether this proof was to come before the termination notices were sent, as the appellant contends, or at trial.

thorizes the appellate court to make independent factual determinations without resorting to remand where the record contains sufficient dispositive facts for decision."

Appellant Thomas agreed to forbear his legal right to execute the judgment order which contained the 1.28 million dollar settlement as well as the prejudgment interest amounting to $200,000 in exchange for one extra year of employment (the 1982–83 school year) for the 37 employees. The only conditions to the agreement were those contained in paragraph six, which would allow the Board to terminate the employees if it proved that the terminations were linked to federal funds (or the other conditions contained in 6(a) and (c)).

"Forbearance in the enforcement of a legal right is a traditional consideration in contract law." *Cochran v. Ollis Creek Coal Co.*, 157 W.Va. 931, 937, 206 S.E.2d 410, 414 (1974). In exchange for the employees' forbearance of their legal right, the Board promised to retain the 37 employees (who previously received termination notices, effective at the conclusion of the 1981–82 school year), for one additional year of employment, the 1982–83 school year. The conditions in the contract that would relieve the Board of its promise were contained in provisions 6(a)(b) and (c). Specifically, the Board alleged the terminations were linked to the loss of federal funds. Therefore, under the terms of provision 6, the Board, through its superintendent, had to prove that terminations were linked to the loss of federal funds.

When a promisor has undertaken to do a particular act and fails to do what he is contractually bound to do, a breach occurs. *Jefferson Cooperage Co. v. Getzendanner*, 116 W.Va. 489, 182 S.E. 90 (1935). Prior to notifying the 37 employees of their termination for school year 1982–83, the Board never proved to Thomas that the termination notices were linked to the loss of federal funds. Nor do the Board minutes of the termination hearings establish that the terminations were linked to such losses. The Board contended in its answer to the complaint that the terminations were linked

to the loss of $359,853 in federal funds. At trial, the Board only proved a $96,000, or 4%, loss of federal funds, and alleged that this amount accounted for 27 of 37 terminations. Based on the evidence in the record, the appellees failed to prove, at any time, that the terminations were linked to the loss of federal funds. Therefore, the appellees breached the contract.

In syllabus point 2 of *Cochran, supra*, we held:

In the event of breach of a contract grounded upon the consideration of the promisee's forbearance in the enforcement of a legal right, it is not necessary for the promisee to prove that he has suffered a deterioration in his original position, and he may elect either to enforce the original right or sue directly on the contract.

Specific performance is available to enforce compromise or settlement agreements. *Floyd v. Watson*, 163 W.Va. 65, 68–69, 254 S.E.2d 687, 690 (1979). This action was filed in October, 1982. School year 1982–83 had already begun. Nonetheless, the appellant sought the remedy of specific performance by requiring reinstatement of the 37 employees.

Specific performance is an equitable remedy which compels the performance of a contract on the precise terms agreed upon or such a substantial performance as will do justice between the parties under the circumstances. It is a means of compelling a contracting party to do precisely what he should have done without being coerced by a court. [Citations omitted] The object in such cases is to place the party without fault in as nearly the same position as he would have been had there been no default by the other party. [*McCoy Farms, Inc. v. J & M McKee*, 263 Ark. 20, 563 S.W.2d 409, 415 (1978)]

*Floyd, supra*, 163 W.Va. at 70, 254 S.E.2d at 690.

In his brief, counsel for the appellant concedes that given the protracted litigation in this matter, specific performance through reinstatement for the 1982–83

school year would be impossible. Furthermore, contrary to the termination announcement, the incomplete record indicates that three-fourths of the 37 employees were rehired for the 1982–83 school year.[9]

The appellant, therefore, asks the Court to provide the appellant a remedy that will "do justice between the parties." *Floyd, supra.* In this case, of the original 37 employees, those not reinstated for school year 1982–83 are awarded their salaries for that school year, as requested by appellate counsel.[10] However, as an equitable remedy, which seeks to place the parties in the position they would have been, had the contract not been breached, the amount due each of that portion of the 37 employees not reinstated for school year 1982–83 will be subject to an offset of each employee's actual earnings during the 1982–83 school year. This measure of damages best suits the purpose of the equitable remedy.

Based on all the foregoing, the February 5, 1987 order of the Circuit Court of McDowell County is reversed, and the case is remanded to the circuit court for the purpose of calculating damages.

Reversed and remanded.

McGRAW, J., participated and concurred in this decision but departed from the Court prior to the preparation of the opinion. Justice WORKMAN did not participate in the consideration or decision of this case.

---

**9.** All 37 employees were rehired for the 1983–84 school year. The record does not reveal the circumstances of the remaining one-third of the original 37 employees during the 1982–83 school year.

**10.** Appellate counsel, noting the discretionary nature of the equitable remedy, asked for either this measure of damages, or $200,000 in prejudgment interest, the right the employees forbeared. *See* syl. pt. 2, *Floyd, supra.*