# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

FRANK INVESTMENTS RANSON, LLC, :
FRANK THEATRES RANSON, LLC and :
30 WEST PERSHING, LLC, :
                                  :
          Plaintiffs,             :
                                  :
     v.                           :     **C.A. No. 11101- VCN**
                                  :
RANSON GATEWAY, LLC, CARL M.      :
FREEMAN ASSOCIATES, INC.  and     :
UNIDENTIFIED ENTITY USING         :
"CARL M. FREEMAN COMPANIES,"      :
                                  :
          Defendants.             :

## MEMORANDUM OPINION

Date Submitted:  October 26, 2015
Date Decided:  February 26, 2016

Christos T. Adamopoulos, Esquire and Josiah R. Wolcott, Esquire of Connolly Gallagher LLP, Wilmington, Delaware, and David S. Mandel, Esquire and William Mark Mullineaux, Esquire of Astor Weiss Kaplan Mandel, LLP, Philadelphia, Pennsylvania, Attorneys for Plaintiffs.

Brian M. Rostocki, Esquire of Reed Smith LLP, Wilmington, Delaware, and Joseph S. Luchini, Esquire and Thomas R. Folk, Esquire of Reed Smith LLP, Falls Church, Virginia, Attorneys for Defendants.

NOBLE, Vice Chancellor

# I. INTRODUCTION

This lawsuit arose from a commercial real estate deal gone awry. In 2008, Plaintiff Frank Investments Ranson, LLC ("Frank") acquired land from Defendant Ranson Gateway, LLC ("Ranson") for use as a movie theater.[1] As part of the deal, Ranson agreed to make certain improvements to the land (the "Site Improvements") and Frank agreed to reimburse Ranson in an amount up to $986,000 for making those improvements.[2] For several years after the sale, though, the site remained undeveloped. As part of an effort to move things along, an individual associated with Ranson indicated Ranson would perform the Site Improvements without reimbursement.[3] The parties' current controversy stems in large part from their failure to memorialize that valuable assurance in a formally executed contract or amendment.

Frank and its affiliates thereafter sought to finance construction of the movie theater through a sale and leaseback transaction with Plaintiff 30 West Pershing, LLC ("West Pershing").[4] After the sale and leaseback closed, Ranson, it is alleged, reneged on its earlier agreement to perform the Site Improvements at its own expense.[5] West Pershing, Frank, and Frank's affiliate have since sued on theories

---

[1] Verified Am. Compl. ("Compl.") ¶¶ 1, 4, 10–11.
[2] *Id.* ¶¶ 14–15; *Id.* Ex. 2 (Development Agreement) §§ 4.2(a), 6.1.
[3] Compl. ¶ 16.
[4] *Id.* ¶ 27.
[5] *Id.* ¶¶ 42–43.

1

of breach of contract, anticipatory breach of contract, and promissory estoppel. This Memorandum Opinion resolves Defendants' Motion to Dismiss those claims for failure to state a claim under Court of Chancery Rule 12(b)(6). For reasons that follow, the Motion is denied.

## II. BACKGROUND[6]

### A. *The Parties*

The Plaintiffs in this case are West Pershing, Frank, and Frank Theatres Ranson, LLC ("Frank Theatres").[7] Frank Entertainment Companies, LLC ("Frank Entertainment") is the parent of Frank Investments, LLC ("Frank Investments"), Frank, and Frank Theatres (collectively, the "Frank Companies").[8] Frank and Frank Theatres are both Delaware limited liability companies.[9] West Pershing is a Missouri limited liability company whose parent is EPR Properties, a real estate investment trust that invests in entertainment properties.[10]

---

[6] As noted, this Motion to Dismiss has been brought under Rule 12(b)(6). Accordingly, this fact section draws from well-pleaded allegations in the Verified Amended Complaint (the "Complaint") and exhibits attached thereto. *See* Ct. Ch. R. 12(b); *Latesco, L.P. v. Wayport, Inc.*, 2009 WL 2246793, at *1 n.1 (Del. Ch. July 24, 2009).

[7] Compl. ¶¶ 1–3.

[8] *Id.* ¶¶ 1–2.

[9] *Id.*

[10] *Id.* ¶¶ 3, 19. EPR Properties was named "EPT" during certain events described in this Memorandum Opinion, but is nonetheless called EPR Properties throughout for purposes of clarity. *Id.* ¶ 66.

The Defendants in this case are Ranson, Carl M. Freeman Associates, Inc. ("Freeman Associates") and an Unidentified Entity using the "Carl M. Freeman Companies, Inc."[11] Ranson, a Delaware limited liability company, is the developer of a large, mixed use development called Boulevard at the Potomac Towne Center (the "Boulevard") in Ranson, West Virginia.[12] Freeman Associates is Ranson's parent and a Maryland corporation.[13]

B.    *The First Land Sale*

Frank acquired a parcel of land in the Boulevard (the "Land"), as well as certain related contract rights, through a series of agreements dating between 2007 and 2008. Initially, the contracting parties were Ranson and Frank Investments. To accomplish the initial sale and apportionment of related rights and obligations, Ranson (as seller) and Frank Investments (as purchaser) executed a Purchase Agreement and a Development Agreement, both dated August 15, 2007.[14] Frank Investments later assigned its rights in both agreements to Frank and Ranson conveyed the Land to Frank by Special Warranty Deed.[15]

---

[11] *Id.* ¶¶ 5–6. Freeman Associates and Carl M. Freeman Companies are hereinafter referred to as "Freeman Companies."
[12] *Id.* ¶¶ 9–10.
[13] *Id.* ¶¶ 4–6.
[14] *Id.* ¶¶ 10, 12.
[15] *Id.* ¶¶ 10–12. The Development Agreement provides that it "shall be binding upon and inure to the benefit of the executing parties and their respective successors [and] assigns." *Id.* Ex. 2 (Development Agreement) § 13.2.

The Development Agreement addresses preparing the Land for future construction. Under the Development Agreement, Ranson is responsible for making a number of Site Improvements—including, for example, traffic control markings, parking lot lighting, landscaping, curbs, and gutters—that the Development Agreement indicates are "required to enable [Frank] to receive a building permit to construct its building."[16] Frank, in turn, must reimburse Ranson for any Site Improvements up to $986,000.[17] The Development Agreement also required Frank to deliver certain plans and specifications (the "Plans") on or around early September 2007.[18] The Development Agreement does not impose any time constraints on Frank's construction of the movie theater and the Land is currently undeveloped.[19]

In 2011, Mike Reilly, then Chief Operations Officer and Vice President of Freeman Companies, asked Richard Albertson, a real estate consultant associated with the Frank Companies, if anything could be done to help advance construction of the movie theater.[20] After Albertson revealed that the cost of the Site

---

[16] Development Agreement at Recital F; *id.* § 4.2(a); Compl. ¶ 14.

[17] Development Agreement § 6.1.

[18] *See id.* § 2.1; Compl. Ex. 1 (Purchase Agreement) §§ 5.1, 13.26. The Development Agreement requires Frank to deliver "all necessary plans and specifications for the building and other improvements [Frank] intends to construct on the Lot in the forms required by the City of Ranson to obtain a Building Permit." Development Agreement § 2.1(a).

[19] Compl. ¶ 13.

[20] *Id.* ¶ 16.

Improvements was an impediment to proceeding, Reilly conveyed that Ranson would construct the Site Improvements and not seek reimbursement.[21] In furtherance of those discussions, Reilly sent Albertson an email dated September 29, 2011 telling Albertson "we will go forward with the deal as you've outlined – we will finish the site work."[22] On or about January 2012, Richard Lipsky, then Vice President of Operations and Finance of Freeman Companies, assumed Reilly's responsibilities in dealing with Frank Companies on this matter.[23]

C.    *The Second Land Sale: The Sale-and-Leaseback*

Frank began to pursue financing options after Ranson and Freeman Companies promised to bear the costs of the Site Improvements.[24] To that end, Frank negotiated a deal with West Pershing through which West Pershing would buy the Land, lease it back to Frank Theatres, and advance funds for the movie theater's construction (the "Sale-and-Leaseback").[25] During the spring of 2012, as negotiations with West Pershing continued, Albertson told Lipsky and others that Frank, Frank Theatres, and West Pershing would only complete the Sale-and-Leaseback if the promise to waive reimbursement was abided and put in writing.[26] Lipsky and Albertson thereafter came to an agreement: Ranson and Freeman

---

[21] *Id.*
[22] *Id.* Ex. 19.
[23] Compl. ¶ 21.
[24] *Id.* ¶ 17.
[25] *Id.* ¶ 18.
[26] *Id.* ¶ 22.

5

Companies would perform the Site Improvements without reimbursement and the Frank Companies would commit to building a theater and operating it as intended in the Development Agreement by closing on a transaction that ultimately took the form of the Sale-and-Leaseback.[27]

A subsequent set of documented communications addresses that agreement. On June 6, 2012, Lipsky sent an email to Albertson (the "June Email") stating:

> I will draft a letter tomorrow morning (I need to head out to a meeting now out of the office) stating that the developer will compete [sic] the site work but will need to include in the letter that the work will be completed subject to amending the existing development agreement which will need to include a provision where the theater must open.[28]

Lipsky followed up by sending an email on June 8, 2012 with an attached letter dated June 7, 2012 (the "June Letter"). The June Letter reads:

> I'm writing in regards to the theater deal in the Potomac Towne Center in Ranson, WV. As you are aware, the Developer, Carl M. Freeman Companies has agreed in a prior development agreement to complete all the site work and receive a reimbursement from Frank Entertainment Companies.
>
> It is the our [sic] intention to help move along the deal that you have with [EPR Properties] by amending the current development agreement to require the Developer to complete the site work as originally intended but forgo any reimbursement. In consideration of this change we ask that it be documented in the development agreement that Frank Entertainment and/or [EPR Properties] commit that they will complete the vertical improvements and operate the improvements as a Theater as intended.[29]

---

[27] *Id.* ¶ 23.
[28] Compl. Ex. 20 (June Email).
[29] Compl. Ex. 4 (June Letter).

The June Letter's page layout includes a top-of-page letterhead reading "Carl M. Freeman Companies®" in stylized text.[30] It is addressed to Rob Reynolds, the Chief Financial Officer and Chief Operating Officer of Frank Entertainment.[31] Lipsky's signature block title reads "Vice President of Operations and Finance."

The Sale-and-Leaseback closed a few days later on June 13, 2012.[32] Frank sold the Land to West Pershing for $1.35 million and Frank Theatres entered into a 20-year Lease Agreement with West Pershing whose terms included four 5-year tenant options to extend the lease and minimum rent payments amounting to $18,055,180.[33] Frank Theatres and West Pershing entered into a Theater Development Agreement in which West Pershing agreed to contribute up to $8,807,400 to construction efforts.[34]

D.    *Defendants Refuse to Make Site Improvements Without Reimbursement*

During July and August of 2012, Frank, Frank Theatres, and West Pershing discussed an amendment to the Development Agreement with Ranson and the Freeman Companies.[35] Counsel for Plaintiffs received a draft Amended and Restated Development Agreement ("Defendants' Amendment") from Defendants

---

[30] *See id.*
[31] *Id.*; Compl. ¶ 26.
[32] Compl. ¶ 27.
[33] *Id.* ¶ 28.
[34] *Id.*; *see also id.* Ex. 8 (Theater Development Agreement) § 2.2.
[35] Compl. ¶ 36.

on July 11, 2012.[36] Defendants' Amendment incorporated features of Lipsky's Letter but added terms not previously discussed by the parties.[37] Plaintiffs' counsel responded with a revised Amended and Restated Development Agreement ("Plaintiffs' Amendment") on August 14, 2012.[38]

Lipsky and Albertson briefly discussed a construction schedule in November before discussions ultimately broke down a month later. In a November 2012 email exchange, Albertson expressed an interest in discussing "when you want to start the site work," to which Lipsky responded "[w]e would set to start construction in early spring."[39] In a December 13, 2012 email, however, Lipsky told Albertson:

> We met with our board yesterday and gave them an update on the Theater. They were not happy about the delay and discussed that it was not a good investment. **I was instructed to rescind the current deal** that would have us complete the entire site work without reimbursement.
> …
> If not dead on your end, I'd like to discuss a way to bring [the deal] back to life. Our board did indicate that they would consider moving forward at a smaller capital investment of $500K contribution to the site work.[40]

---

[36] *Id.* ¶ 34; *see id.* Ex. 12 (Defendants' Amendment).
[37] Compl. ¶ 35.
[38] *Id.* ¶ 38; *see id.* Ex. 16 (Plaintiffs' Amendment).
[39] Compl. Ex. 13.
[40] Compl. Ex. 7 (emphasis added).

Lipsky identified himself in this email as the Vice President of Commercial Real Estate at Carl M. Freeman Companies.[41] Defendants continue to refuse to construct the Site Improvements.[42]

E. *Procedural History*

On August 10, 2015, Plaintiffs filed the Complaint which brings five Counts as follows:

- Count I: Breach of contract against Defendants for breaching the amended Development Agreement (seeking specific performance of the amended Development Agreement);[43]
- Count II: Same (seeking damages for Frank and Frank Theatres);[44]
- Count III: Anticipatory breach of contract against Defendants (seeking damages for Frank and Frank Theatres);[45]
- Count IV: Promissory estoppel (seeking damages for Frank and Frank Theatres);[46]
- Count V: Promissory estoppel (seeking damages for West Pershing).[47]

Counts seeking damages assert that Plaintiffs' injuries include "delay of the construction of the theater and lost revenue, lost profits, increased costs, increased interest expenses and loss of business opportunities."[48] Plaintiffs also seek

---

[41] *Id.*
[42] Compl. ¶ 43.
[43] *Id.* at 26, ¶¶ 47–53.
[44] *Id.* ¶¶ 54–57.
[45] *Id.* ¶¶ 58–60.
[46] *Id.* ¶¶ 61–63.
[47] *Id.* ¶¶ 64–69.
[48] *Id.* ¶¶ 57, 60, 63 & 69.

attorneys' fees and costs, as well as pre-judgment and post-judgment interest on all monetary awards.[49]

Defendants now seek wholesale dismissal of Plaintiffs' action through their Motion to Dismiss filed on August 24, 2015. This is the Court's decision on the Motion after briefing and oral argument.

## III. STANDARD OF REVIEW

Defendants challenge each Count as failing to state a claim upon which relief can be granted under Court of Chancery Rule 12(b)(6). The standards for surviving such a defense are minimal.[50] The Court must accept as true all well-pleaded facts, "accept even vague allegations as well-pleaded if they give [Defendants] notice of the claim," and "draw all reasonable inferences in favor" of the Plaintiffs.[51] It need not, however, "accept conclusory allegations unsupported by specific facts."[52] Dismissal is only warranted if well-pleaded allegations fail to entitle Plaintiffs to relief "under any reasonably conceivable set of

---

[49] *Id.* at 26.

[50] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Hldgs. LLC*, 27 A.3d 531, 539 (Del. 2011).

[51] *Id.* at 535 (internal quotation marks omitted).

[52] *Prince v. E.I. DuPont de Nemours & Co.*, 26 A.3d 162, 166 (Del. 2011).

10

circumstances."[53]  Accordingly, "failure to plead an element of a claim precludes entitlement to relief and, therefore, is grounds to dismiss that claim."[54]

## IV.  ANALYSIS

Defendants challenge Plaintiffs' claims on a number of grounds. Defendants' first and most ambitious argument—*i.e.*, the one that takes aim at the most Counts—is that the Development Agreement was never amended and therefore that Defendants' conduct cannot give rise to a contract-based claim. Defendants bring more particularized challenges to Plaintiffs' contract claims by asserting that Plaintiffs' failure to timely provide the Plans is a failure of a condition precedent and a bar to recovery, that Plaintiffs have not suffered contractual damages, and that specific performance is not available for the construction of Site Improvements.  Defendants challenge Counts IV and V by arguing that several elements of promissory estoppel are absent.  Finally, Defendants claim that Plaintiffs have not alleged adequate facts entitling them to relief in the form of either consequential damages or attorneys' fees and costs. Discussion proceeds in that order.

---

[53] *Pontone v. Milso Indus. Corp.*, 100 A.3d 1023, 1036 (Del. Ch. 2014) (internal quotation marks omitted).
[54] *Id.* (internal quotation marks omitted).

A.     *Breach of Contract and Anticipatory Breach*

Defendants challenge Plaintiffs' contract claims in Counts I–III by denying the existence of an amended contract and contesting other elements essential to a breach of contract claim.  The Development Agreement contains a West Virginia choice of law clause.[55]  Under West Virginia law, a breach of contract claim has four elements: "[1] the existence of a valid, enforceable contract; [2] that the plaintiff has performed under the contract; [3] that the defendant has breached or violated its duties under the contract; and [4] that the plaintiff has been injured as a result."[56]  Defendants dispute elements (1), (2), and (4).

1.     <u>Existence of a Valid, Enforceable Contract</u>

Defendants argue that they cannot be liable under Counts I, II, or III because Plaintiffs have not alleged facts sufficient to support a conclusion that the parties amended the Development Agreement.  "[A] written contract may be modified or superseded by a subsequent contract based on valuable consideration."[57]  To prove a modification occurred, Plaintiffs must "show the parties expressly agreed to any such modification, and any such modification had all the requisites of a valid and

---

[55] Development Agreement § 13.16.
[56] *Exec. Risk Indem., Inc. v. Charleston Area Med. Ctr.*, 681 F. Supp. 2d 694, 714 (S.D.W. Va. 2009).
[57] *John W. Lodge Distrib. Co., Inc. v. Texaco, Inc.*, 245 S.E.2d 157, 159 (W. Va. 1978).

enforceable contract."[58] Those requisites include (1) competent parties with authority to enter into the agreement; (2) legal subject matter; (3) separate, identifiable consideration; and (4) mutual assent to all essential terms.[59]

It is reasonably conceivable, for a number of reasons, that the parties amended the Development Agreement. First, Plaintiffs have sufficiently pleaded that Lipsky had authority to bind Defendants. An agent acting with actual or apparent authority can bind a principal.[60] Apparent authority is inferred from "statements, conduct, lack of ordinary care, or other manifestations of the principal's consent, whereby third persons are justified in believing that the agent is acting within his authority."[61] Although Plaintiffs' allegations do not establish the existence of any writing specifically empowering Lipsky to bind Defendants, the Complaint repeatedly alleges that Lipsky was "acting on behalf of Freeman Companies and [Ranson]"[62] at relevant times and objective indicia suggest that Frank justifiably believed Lipsky was acting with authority.

---

[58] *Wood Cnty. Airport Auth. v. Crown Airways, Inc.*, 919 F. Supp. 960, 967 (S.D.W. Va. 1966).

[59] *State ex. rel. AMFM, LLC v. King*, 740 S.E.2d 66, 73 (W. Va. 2013); *Bright v. QSP, Inc.*, 20 F.3d 1300, 1304–05 (4th Cir. 1994); *Wood Cnty.*, 919 F. Supp. at 967.

[60] *Clint Hurt & Assocs., Inc. v. Rare Earth Energy, Inc.*, 480 S.E.2d 529, 535–36 (W. Va. 1996).

[61] *E.g.*, *id.* at 536; *Messer v. Huntington Anesthesia Gp., Inc.*, 664 S.E.2d 751, 759 (W. Va. 2008).

[62] *E.g.*, Compl. ¶¶ 23, 30, 33.

Lipsky's communications hint at both Ranson's interconnectedness with Carl M. Freeman Companies and Lipsky's own capacity to act on each entity's behalf. Lipsky represented to Albertson that Ranson was a Carl M. Freeman Company and that Lipsky had authority to act for "Carl M. Freeman Companies" and Ranson.[63] Further, in the June Letter, Lipsky stated that "the Developer, Carl M. Freeman Companies has agreed in a prior development agreement to complete all the site work . . ." despite the fact that Ranson is the Development Agreement's signatory. Thus, Plaintiffs could justifiably conclude that the scope of Lipsky's authority extended to Carl M. Freeman Companies and Ranson. Further, through the course of his communications with Albertson, Lipsky identified himself as an officer of Carl M. Freeman Companies,[64] used Carl M. Freeman Companies letterhead, and used the pronouns "our" and "we" to convey the positions and intentions of actors that one might reasonably infer include Carl M. Freeman Companies and Ranson.[65] Although, as Defendants point out, the Purchase Agreement, Development Agreement, and Plaintiffs' Amendment each fail to name Reilly or Lipsky as duly authorized officers on the signature pages,

---

[63] *Id.* Ex. 22 (Albertson Affidavit) ¶¶ 4–8. The Complaint attaches the Albertson Affidavit and references it as evidence of "the reasonableness of Plaintiff's reliance on the authority" of Lipsky to act on behalf of Ranson and the Freeman Companies. Compl. ¶ 33.

[64] *See* June Letter; June Email.

[65] *See supra* text accompanying note 29.

that fact does not topple the stack of evidentiary cues supporting Plaintiffs' position, especially in the motion to dismiss context.

Second, it is reasonably conceivable that there was mutual assent. One West Virginia court framed the inquiry as follows:

> In order for this mutuality to exist, it is necessary that there be a proposal or offer on the part of one party and an acceptance on the part of the other. Both the offer and acceptance may be by word, act or conduct that evince the intention of the parties to contract. That their minds have met may be shown by direct evidence of an actual agreement or by indirect evidence through facts from which an agreement may be implied.[66]

In short, objective manifestations of intent must reveal that parties had the same understanding of the terms of the agreement reached.[67]

Plaintiffs' contract formation theory is that although Ranson first promised to forgo reimbursement some time during 2011, the parties did not officially amend the Development Agreement until the spring of 2012 (the "Spring 2012 Agreement") or some time shortly thereafter.[68] In particular, the Complaint avers

---

[66] *Ways v. Imation Enters. Corp.*, 589 S.E.2d 36, 44 (W. Va. 2003) (internal citations omitted) (quoting *Bailey v. Sewell Coal Co.*, 437 S.E.2d 448, 450–51 (W. Va. 1993)).

[67] *See New v. GameStop, Inc.*, 753 S.E.2d 62, 71 (W. Va. 2013); *Conley v. Johnson*, 580 S.E.2d 865, 869 (W. Va. 2003).

[68] Compl. ¶ 23. The Complaint, *see* Compl. ¶¶ 23–27, is somewhat nonspecific in its designation of when the amendment took place. It labels the Spring 2012 Agreement as the "Forgo Reimbursement Amendment" but claims that the June Letter "confirmed" the Forgo Reimbursement Amendment, a sequence that leaves the moment of contract formation unclear. This ambiguity is problematic because Frank Companies' undertaking under the two agreements may be viewed as

15

that Lipsky, acting on behalf of Ranson and Freeman Companies, and Albertson, acting on behalf of Frank Companies, reached the following agreement: "Frank Companies would commit to completing a theater and operating the theater as intended in the Development Agreement by closing on the transaction and selling the Land to 30 West Pershing and in exchange [Ranson] and Freeman Companies promised to construct the [Site Improvements] with no reimbursement from the Frank Companies."[69] The Complaint describes the June Letter as "confirming" prior understandings. Thereafter, Frank Companies closed on the Sale-and-Leaseback, a transaction whose operative documents obligate Frank Theatres to build and operate a movie theater. To wit, the Theater Development Agreement requires Frank Theatres to take a number of actions in furtherance of building a movie theater on the Land;[70] and the Lease Agreement provides that Frank

slightly different. Under the Spring 2012 Agreement, Frank Companies might simply have had to commit to building and operating a theater; while under the June Letter, Frank Companies had to commit in writing by adjusting the terms of the Development Agreement. So long as there was mutual assent, either theory is viable; and as noted below, subsequent conduct (including, most notably, execution of the Theater Development Agreement and Lease Agreement, as well as the exchange of competing draft amendments) avoids a definiteness problem. *See infra* notes 70–73 and accompanying text. Although the Complaint is far from a model of clarity, it contains facts which, when viewed in a light most favorable to Plaintiffs, make it reasonably conceivable that there was mutual assent.

[69] *Id.* The Complaint does not specify precisely when this bargain was struck or whether it was written or oral.

[70] Theater Development Agreement § 1.2 (obligating Frank Theatres to cause a general contractor to submit a contract detailing the theater's construction and facilitating the construction as reasonably necessary pursuant to industry standards

16

Theatres must operate the premises as a movie theater, subject to a litany of use restrictions, as well as pay the premises' operating costs.[71] Finally, the parties attempted in vain to execute an amended Development Agreement whose terms would include both Ranson's obligation to perform Site Improvements without reimbursement and Frank's obligation to build and operate a movie theater.

There are sufficient allegations that an agreement was struck to survive a motion to dismiss. The Complaint avers that Lipsky and Albertson had "reached an agreement" in spring 2012; the parties took subsequent actions that, viewed in a light most favorable to Plaintiffs, may be construed as attempts to perform their respective ends of the bargain;[72] and, perhaps most tellingly, Lipsky's December

---

of construction); *id.* § 9 (obligating Frank Theatres to use commercially reasonable efforts to require the general contractor to complete the construction).

[71] Compl. Ex. 6 (Lease Agreement) §§ 6.1–.4, 8.1–.5.

[72] *See* Restatement (Second) of Contracts § 34 cmt. c ("[P]art performance may give meaning to indefinite terms of an agreement, or may have the effect of eliminating indefinite alternatives by waiver or modification. In such cases a bargain may be concluded, but it may be impossible to identify offer or acceptance or to determine the moment of formation. The obstacle of indefiniteness may nevertheless be removed." (internal citations omitted)). Further, Plaintiffs allege that Frank Companies thought that they could fulfill their obligation by entering into the transaction that became the Sale-and-Leaseback. During the parties' negotiations of an amended Development Agreement, Albertson sent Lipsky an email stating "our legal obligation to [EPR Properties] per the Lease and the Development Agreement . . . should satisfy Freeman's concerns over the Development taking place. Hope this helps explain the position of [EPR Properties] and Frank." Compl. Ex. 11. In context, the term "Development Agreement" in that email can be read as referring to the Theater Development Agreement. Further, after receiving Lipsky's December email purporting to "rescind the current deal," counsel for Frank sent counsel for Defendants an email

email in which he wrote "I was instructed to rescind *the current deal that would have us complete the entire site work without reimbursement*"[73] might be construed as acknowledging that a deal existed. The terms of the deal reached are opaque, but it is nonetheless reasonably conceivable both that they are sufficiently definite to be enforced and that the parties' objective manifestations evidence an intent to be bound.[74] Defendants may eventually prevail on both points with the benefit of a fuller record, but at this juncture the Court cannot conclude that the Complaint fails to meet Rule 12(b)(6)'s threshold on the question of whether there was mutual assent.

Third and finally, Defendants' claim that any purported contract lacked valuable consideration is without merit. "Consideration has been defined as 'some right, interest, profit, or benefit accruing to one party, or some forbearance,

---

taking a similar position: "Since Frank had already committed to [EPR Properties] that it would complete the vertical improvements and operate the same as a theatre (and in fact, these commitments were personally guaranteed by Bruce Frank, the ultimate owner of Frank), [the requirements stated in the June Letter] were never an issue." Compl. Ex. 9 at 2.

[73] Compl. Ex. 7 (emphasis added). This is at odds with Defendants' invocation of the June Letter—in particular, Lipsky's reference to "our intention to move along the deal you have with [EPR Properties] by amending the current development agreement" to forgo reimbursement—to argue that Defendants did not think a deal was struck.

[74] *See supra* note 68.

detriment, loss, or responsibility given, suffered, or undertaken by another."[75] Here, the Frank Companies' entry into the Sale-and-Leaseback entailed undertaking numerous expenses and responsibilities—including, for example, Frank selling its land to West Pershing and Frank Theatres incurring the obligations contained in the Lease and Theater Development Agreements—that would benefit Ranson by virtue of the fully operational theater's positive impact on the entire development.[76] Ranson, in turn, conferred a benefit by suffering a readily identifiable loss: relinquishing its right to receive reimbursement from Frank under the original Development Agreement.

For all of these reasons, Plaintiffs have sufficiently pleaded the existence of an enforceable contract. Analysis now turns to the second breach of contract element that Defendants challenge.

2.    Plaintiffs' Performance Under the Contract

Defendants next argue that Plaintiffs cannot recover for breach of an amended Development Agreement because Frank has failed to allege that it performed a condition precedent to Ranson's construction of the Site Improvements: delivering the Plans by early September 2007. In support of that contention, Defendants point out that no Plans appear in the Theater Development

---

[75] *Cook v. Heck's Inc.*, 342 S.E.2d 453, 458 (W. Va. 1986) (internal quotation marks omitted) (quoting *First Nat. Bank v. Marietta Mfg. Co.*, 153 S.E.2d 172, 177 (W. Va. 1967)).
[76] Compl. ¶ 24.

Agreement despite the fact that its recitals indicate that a site plan[77] for the premises (including both land and the movie theater building) is attached in an "Exhibit B" and a list of the plans and specifications[78] for building the movie theater is attached in an "Exhibit C." Both exhibits are indeed blank.

Although Defendants correctly assert that "[a] party's failure to perform its own obligations precludes recovery against another party for breach of contract,"[79] their argument fails because it is reasonably conceivable from properly reviewable facts[80] that Plaintiffs did not violate a condition precedent. The absence of Plans in the Theater Development Agreement is of questionable inferential value for a

---

[77] The Theater Development Agreement indicates that a "site plan for the Property and Improvements is attached hereto as Exhibit 'B'." Theater Development Agreement at Recital D. The term "Property" refers to a "6.8 acre site" described in an attached exhibit that is presumably the Land. *Id.* at Recital A; *see* Purchase Agreement § 2.1(a) (describing the Land as a parcel of land containing about 6.8 acres). The term "Improvements" is defined as "a 12-screen, approximately 57,554 square foot, approximately 1,750 seat motion picture theatre facility." *Id.* at Recital C. Exhibit B has a heading that reads "Site Plan" but is otherwise blank. *Id.* Ex. B.

[78] The Theater Development Agreement indicates that a "listing of the plans and specifications for the construction of the Improvements . . . is attached hereto as Exhibit 'C' . . . ." Theater Development Agreement at Recital D. Exhibit C to the Theater Development Agreement is titled "List of Plans and Specifications" and is blank aside from the proviso: "To be attached by amendment upon completion." *Id.* Ex. C.

[79] *Wood Cnty.*, 919 F. Supp at 968.

[80] Both parties have proffered facts—both in exhibits and in their briefs—outside the pleadings relating to Defendants' claim that a condition precedent has been breached. This sort of evidence may prove important at trial. In this procedural posture, however, the Court does not consider this evidence and instead limits itself to evidence in the Complaint and exhibits thereto. *See supra* note 6; *see also In re Santa Fe Pacific Corp. S'holder Litig.*, 669 A.2d 59, 68 (Del. 1995).

20

number of reasons, including the fact that it is not clear on this record that construction conditions remained static between 2007 and 2012 such that the same plans would still suffice; that Frank's design and layout preferences remained static during the same period; or that the same Plans referenced in the Development Agreement (which addressed the building of Site Improvements necessary for building permits) were asked for in the Theater Development Agreement (which addressed the building and operation of a movie theater).[81]  Further, there is some—albeit limited—evidence to suggest that the Plans had, in fact, been delivered.  In a November 13, 2012 email exchange, Albertson indicated to Lipsky that "[within the week] I think you and I should talk to see when you want to start the site work," to which Lipsky replied, "[w]e would set to start construction in early spring but would want everything wrapped up with permits ASAP to avoid any delays.[82]  This conversation about the commencement of site work, considered in a light most favorable to Plaintiffs, might imply that Ranson already had the Plans.  Although this may not be the best inference, it is nonetheless reasonable.

---

[81] One indication that the Plans might not have sufficed for the Theater Development Agreement's purposes is the Development Agreement's requirement that "all necessary plans and specifications for the building and other improvements [Frank] intends to construct on the Lot" be submitted "**in the form required by the City of Ranson to obtain a Building Permit.**"  Development Agreement § 2.1(a) (emphasis added).
[82] Compl. Ex. 13.

21

The most powerful allegation dispelling Defendants' claim, however, is the Complaint's averment that "Plaintiffs are, and at all relevant times have been, ready, willing, and able to perform their obligations under the Development Agreement, **and have done so**."[83] This catch-all satisfies Court of Chancery Rule 9(c)'s directive that "[i]n pleading the performance or occurrence of conditions precedent, it is sufficient to aver generally that all conditions precedent have been performed or have occurred."[84] For all of these reasons, Defendants' argument that a condition precedent has been breached fails.

3.    Injury and Relief

Defendants' final challenge to Counts I–III is twofold. First, Defendants argue that none of the Plaintiffs has suffered contractual damages because Frank lost its legal interest in the Land after selling to West Pershing and neither West Pershing nor Frank Theatres are parties to the Development Agreement. Second, Defendants argue that Count I's claim seeking specific performance must be dismissed because specific performance is not an available remedy in this case. For reasons that follow, neither argument succeeds.

To state a claim for breach of contract, Plaintiffs must have been injured as a result of Defendants' breach.[85] Damages suffered in such an action "cannot be too

---

[83] *Id.* ¶ 53 (emphasis added).
[84] Ct. Ch. R. 9(c).
[85] *Exec. Risk.*, 681 F. Supp. 2d at 714.

remote, contingent or speculative, but must consist of actual facts from which a reasonably accurate conclusion could be drawn regarding the cause and amount of such damages."[86]   "If, however, plaintiff can allege a breach of duty by the defendant, then the court can infer that the plaintiff has suffered at least nominal damages sufficient to state a claim."[87]

Plaintiffs' contract-based claims survive under this standard.  As noted, Plaintiffs' well-pleaded theory of contract formation is that in the spring of 2012 or shortly thereafter, a deal with two terms roughly as follows was reached: (1) Frank Companies would commit to opening and operating the movie theater by closing on the Sale-and-Leaseback in exchange for (2) Ranson and Freeman Companies constructing the Site Improvements without reimbursement from the Frank Companies.[88]  It is thus reasonably conceivable that both Frank and Frank Theatres were parties to the agreement and therefore owed contractual duties.  Accordingly, Ranson and Freeman Companies' alleged breach—whether contemporaneous or

---

[86] *Id.* at 726.

[87] *Id.* at 714–15; *see also id.* at 726 ("Because I have found that CAMC has alleged that ERC breached a contract, then I am permitted to infer that CAMC has suffered at least nominal damages sufficient to state a claim.  CAMC may still prove other damages at trial, but nominal damages arising from a breach ensures that CAMC can survive a motion to dismiss.   I therefore **FIND** that CAMC has alleged sufficient facts to state a claim for breach of contract . . . ." (internal citation omitted)).

[88] Compl. ¶¶ 22–23.

anticipatory—supports an inference that Frank and Frank Theatres suffered nominal damages sufficient to state a claim.

Under West Virginia law, "[t]he remedy of specific performance of a contract is not a matter of right in either party, but rests in the sound discretion of the court, to be determined from all the facts and circumstances of the case" and is "to be granted only where the plaintiff makes out his case fully, and there is not only no actual fraud or mistake, but no hardship or oppression, even though these do not amount to legal or equitable wrong."[89] Where appropriate, an order of specific performance aims to place the claimant "in as nearly the same position as he would have been had there been no default by the other party."[90] Relatedly, "the performance granted must be the specific thing called for by the contract."[91]

This analytical framework adjusts somewhat where the claim of breach involves a construction contract:

> Specific performance is not ordinarily decreed of construction contracts because an adequate remedy for damages exists and because of the impracticality of courts supervising contracted work. The rule is not absolute, but one of discretion, and where the particulars of the work are definitely ascertained, plaintiff has a substantial interest in having the contract performed, and money damages will not provide an adequate remedy, courts will order specific performance.[92]

---

[89] *Brand v. Lowther*, 285 S.E.2d 474, 479 (W. Va. 1981).
[90] *Thomas v. Bd. of Educ. of McDowell Cnty.*, 383 S.E.2d 318, 323 (W. Va. 1989) (quoting *Floyd v. Watson*, 254 S.E.2d 687, 690 (W. Va. 1979)).
[91] *Brand*, 285 S.E.2d at 731.
[92] *Floyd*, 254 S.E.2d at 690.

Thus, specific performance of construction contracts is not categorically off-limits under West Virginia law.

Here, it is reasonably conceivable that such a remedy may be appropriate under Rule 12(b)(6)'s lenient standard. Plaintiffs seek specific performance of Ranson's obligation to construct the Site Improvements under the Development Agreement. A review of the contractual provisions governing that obligation reveals, unsurprisingly, that it is a complex task. Further, it appears to require the preparation of a number of documents not presently before the Court.[93] Although there are daunting obstacles to crafting a specific performance order here, the Development Agreement's terms, which are subject to further elucidation as this litigation proceeds, offer an amount of clarity sufficient to survive this motion to dismiss. In addition, the Complaint alleges that Plaintiffs have no adequate remedy at law due to "the unique nature of the real estate that is the subject of the Development Agreement and [Ranson's] unique ability to provide the [Site

---

[93] *See, e.g.*, Development Agreement § 2.1(a)–(c) (referring to the Plans and a "Purchaser Site Plan"); *id.* § 4.1(a) (referring to "Project Site Work Construction Plans" and a "Development Site Plan"); *id.* § 4.3(a) (referring to a "Preliminary Construction Schedule"); *id.* § 4.3(c) (referring to a "Construction Schedule"). The Court acknowledges that the absence of some of these documents is unsurprising given their existence depends on certain preconditions being met.

It appears that delivery of the Plans is a necessary precondition to making the Site Improvements. *See* Development Agreement art. 2. Their absence, then, would likely prove fatal to Plaintiffs' request for specific performance since a hypothetical order would lack a clear and comprehensive set of directives. For reasons already discussed, however, it is reasonable to infer that these Plans exist and have been delivered. *See supra* notes 83–84 and accompanying text.

Improvements] at issue."[94]  For these reasons, as well as the fact that the Site Improvements are a necessary precondition to commencing the project comprehensively,[95] the Court declines to conclude at this juncture that specific performance is not warranted as a matter of law.

Accordingly, Defendants' motion to dismiss Plaintiffs' contract-based claims in Counts I–III is denied.  The Court next addresses the sufficiency of Plaintiffs' promissory estoppel claims brought in Counts IV and V.

B.      *Promissory Estoppel*

West Virginia law requires claimants seeking recovery on a theory of promissory estoppel to prove four familiar elements:

> [1] A promise which [2] the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and [3] which does induce the action or forbearance [4] is enforceable notwithstanding the Statute of Frauds if injustice can be avoided only by enforcement of the promise.  The remedy granted for breach is to be limited as justice requires.[96]

Parameters for assessing the relatively abstract fourth element have been set forth as follows:

> In determining whether injustice can be avoided only by enforcement of the promise, the following circumstances are significant: (a) the availability and adequacy of other remedies, particularly cancellation and restitution; (b) the definite and substantial character of the action or forbearance in relation to the remedy sought; (c) the extent to

---

[94] Compl. ¶ 53.
[95] *Id.* ¶ 50.
[96] *Hoover v. Moran*, 662 S.E.2d 711, 718–19 (W. Va. 2008).

which the action or forbearance corroborates evidence of the making and terms of the promise, or the making and terms are otherwise established by clear and convincing evidence; (d) the reasonableness of the action or forbearance; (e) the extent to which the action or forbearance was foreseeable by the promisor.[97]

Well-pleaded facts substantiating Plaintiffs' promissory estoppel theory can be fairly recounted as follows.[98] In the spring of 2012, Ranson and Freeman Companies made a promise to complete the Site Improvements without reimbursement and that promise was received by Frank, Frank Theatres, and West Pershing.[99] At the time, Ranson and Freeman Companies knew that Frank, Frank Theatres, and West Pershing would not commence the Sale-and-Leaseback absent such a promise.[100] After receiving that promise and allegedly in reliance on it,

---

[97] *Id.* at 719.

[98] Plaintiffs split their promissory estoppel theory into two separate counts. In Count IV, Plaintiffs argue that Frank and Frank Theatres detrimentally relied on Defendants' promise to construct the Site Improvements without reimbursement. In Count V, Plaintiffs argue that West Pershing did the exact same thing.

[99] Compl. ¶¶ 23, 62(a), 66, 68(a). A promise supported by consideration cannot form the basis for recovery on a theory of promissory estoppel. *See, e.g.*, *Genecor Int'l, Inc. v. Novo Nordisk A/S*, 766 A.2d 8, 12 (Del. 2000); *Doctors Hosp. 1997, L.P. v. Sambuca Hous., L.P.*, 154 S.W.3d 634, 636 (Tex. App. 2004); *UFE Inc. v. Methode Elecs., Inc.*, 808 F. Supp. 1407, 1410 (D. Minn. 1992). However, a party asserting a breach of contract claim may plead promissory estoppel in the alternative. *Chrysler Corp. v. Chaplake Hldgs., Ltd.*, 822 A.2d 1024, 1031 (Del. 2003); *see, e.g.*, *TreeFrog Devs., Inc. v. Seidio, Inc.*, 2013 WL 4028096, at *8 (S.D. Cal. Aug. 6, 2013) (holding that the fact that promissory estoppel and breach of contract claims "will ultimately depend on mutually exclusive findings of fact is of no consequence here at the pleading stage"). Here, there is a genuine dispute about whether a contract was formed. Promissory estoppel is therefore appropriately asserted in the alternative.

[100] Compl. ¶¶ 22, 62(b), 68(b).

Frank, Frank Theatres, and West Pershing closed on the Sale-and-Leaseback.[101]

The Sale-and-Leaseback imposes a number of substantive obligations on each party—including Frank's selling its Land; West Pershing's paying $1.35 million for the Land and agreeing to provide roughly $8.8 million toward the costs of constructing the theater; and Frank Theatres' entry into a 20-year lease with minimum rent payments amounting to over $18 million. Because Ranson and Freeman Companies refuse to construct the Site Improvements, however, the theater cannot be built and its construction has therefore been delayed.[102] This has caused the Sale-and-Leaseback parties to incur costs.[103]

Defendants' objections to Counts IV and V concern the facts allegedly supporting elements (2), (3), and (4). As for elements (2) and (3), Defendants argue that an alternative reading of allegations in the Complaint and its exhibits permit inferences contrary to those the Plaintiffs reach, a circumstance that defeats a promissory estoppel claim under *Wallace v. St. Clair*.[104] There, court held that "[t]he facts forming the basis of an estoppel must be clearly proven and not capable of bearing any other construction."[105] Defendants have not shown, however, that West Virginia courts apply the excerpted holding from *Wallace* in

---

[101] *Id.* ¶¶ 27.
[102] *Id.* ¶¶ 50, 63, 69.
[103] *Id.* ¶¶ 63, 69.
[104] 127 S.E.2d 742, 757 (W. Va. 1962) (internal quotation marks omitted) (quoting *Campbell v. Lynch*, 106 S.E. 869 (W. Va. 1921)).
[105] *Id.*

*promissory* estoppel cases; that passage appears amidst a lengthy exegesis of *equitable* estoppel.[106] This Court declines to apply *Wallace* in this case given the lack of authority for such an approach.

It is reasonably conceivable that Plaintiffs have stated a claim for promissory estoppel with respect to Frank, Frank Theatres, and West Pershing. Defendants understandably highlight a number of facts arguably contrary to Plaintiffs' promissory estoppel theory, but none defeats the inferences necessary to conclude that elements (2) and (3) have been satisfied. In particular, Defendants focus on the fact that Lipsky stated in the July Letter that "it is the our [sic] intention to **help move along the deal** that you have with [EPR Properties] by **amending the current development agreement** to require the Developer to complete the site work as originally intended but forgo any reimbursement";[107] that the Theater Development Agreement references a Site Development Agreement that never materialized;[108] and that after the Sale-and-Leaseback closed, Lipsky indicated he had previously "asked to discuss and revise the development agreement with the

---

[106] *Id.* at 757–58; *cf., e.g.*, *Jeffrey v. Seven Seventeen Corp.*, 461 A.2d 1009, 1011 (Del. 1983) ("The concept of equitable estoppel is distinct from the doctrine of promissory estoppel and involves the establishment of different elements."). One clear difference between the two is that, unlike promissory estoppel, equitable estoppel requires a showing that the person to be estopped "intended to mislead or at least was willing that another party might be misled by his attitude." *Wallace*, 127 S.E.2d at 757.

[107] June Letter (emphasis added).

[108] Theater Development Agreement at Recital E.

attorneys before close and was never put in touch with them."[109] These facts, Defendants argue, show two things: (1) that the June Letter did not induce reliance because parties to the Sale-and-Leaseback knew Defendants' promise was not secure until the Development Agreement was formally amended; and (2) that the Defendants did not reasonably expect their actions would induce reliance because from their perspective both sides understood that the Development Agreement had to be amended.

This argument only seems to consider the possibility that parties to the Sale-and-Leaseback relied on the June Letter, not another promise that the Complaint alleges was given in spring of 2012. The Complaint permits the latter inference too. It frames the Spring 2012 Agreement as including a simple promise to complete the Site Improvements without reimbursement and does not include an additional proviso that a formal, amended Development Agreement be executed. Thus, it is reasonably conceivable that the June Letter was viewed as (1) confirming an amendment to the Development Agreement that had already occurred and (2) asking for something the parties never previously agreed to: documenting Frank Entertainment's commitment to build and operate a theater in the Development Agreement. Plaintiffs' subsequent attempt to actualize (2) without success does not necessarily render (2) a part of the Spring 2012

---

[109] Compl. Ex. 11.

Agreement, nor does it necessarily indicate that all sides understood it to be. Thus, Plaintiffs' story provides a reasonably conceivable factual pathway to meeting the second and third elements of a promissory estoppel claim.[110]

Finally, Defendants argue that the fourth element cannot be met because the parties to the Sale-and-Leaseback can rescind all agreements and thereby restore the *status quo ante* since the Land remains undeveloped. This argument deserves weight, but is not the only consideration that drives the multi-faceted prevention of injustice inquiry, which permits the courts to consider the degree of foreseeability of the action and the substantial character of the action in relation to the relief sought.[111] Here, strong allegations of foreseeability and clear, significant changes in position counterweigh Defendants' argument. It is a close call, but the fourth element is met.

Accordingly, Defendants' Motion to Dismiss is denied in its entirety.[112] The only two remaining issues concern Defendants' challenges to Plaintiffs' requests for consequential damages and attorneys' fees.

---

[110] The Court acknowledges, however, a factual tandem weighing against the third element: that (1) despite being sophisticated parties, Frank, Frank Theatres, and West Pershing (2) closed on a significant, multi-million dollar transaction without an ironclad, formal writing.

[111] *See Hoover*, 662 S.E.2d at 719.

[112] Defendants argue that Carl M. Freeman Associates ought to be dismissed from this case because the Complaint fails to make specific allegations implicating that entity in the conduct giving rise to Plaintiffs' various causes of action. That request is denied. Throughout the Complaint, Plaintiffs refer to the "Freeman

C.    *Consequential Damages*

Plaintiffs' request for relief includes damages for "the delay of the construction of the theater and lost revenue, lost profits, increased costs, increased interest expenses and loss of business opportunities."[113] Defendants challenge that request on grounds that it was not foreseeable that delay-related costs would result from (1) Frank's own failure to deliver the Plans and (2) Plaintiffs' failure to simply make the Site Improvements themselves.[114] Further, argue Defendants, Plaintiffs' profit projections were not known to Defendants at the time of contracting.

Unlike direct damages, consequential damages do not flow directly from the breach of a contract; they instead "arise from the special circumstances of the contract."[115] A plaintiff may recover consequential damages by showing that "at the time of the contract the parties could reasonably have anticipated that these damages would be a probable result of a breach."[116]

---

Companies" as the party performing the acts in question and defines "Freeman Companies" as "Defendant Carl M. Freeman Associates, Inc. and/or Defendant Unidentified Entity." Compl. ¶ 6. This wordsmithing implicates Carl M. Freeman Associates as potentially liable for each claim "Freeman Companies" is.

[113] *Id.* ¶¶ 57, 60, 63, 69.

[114] Defendants suggest that, in the event of Defendants' breach, Plaintiffs would have been expected to build the Site Improvements and then bring suit to recover the costs incurred in doing so.

[115] *Desco Corp. v. Harry W. Trushel Constr. Co.*, 413 S.E.2d 85, 89 (W. Va. 1991).

[116] *Id.*

Here, special circumstances of the Development Agreement made it reasonably foreseeable that breach would result in certain damages. Both parties knew that Defendants' fulfillment of its obligation to construct the Site Improvements was a precondition to proceeding with construction and that the project's aim was to operate a movie theater for profit. Accordingly, at the time of contracting, Defendants could have foreseen that a breach on their part would impose costs associated with delay. Although Defendants may be right that a certain portion of those delay-related costs was attributable to causes unforeseen at the time of contracting, measuring an amount of recoverable damages is a fact-based question properly addressed at trial.[117]

D.     *Attorneys' Fees*

Finally, Defendants challenge Plaintiffs' request for an award of "attorneys' fees and costs incurred in bringing this action."[118] The Court need not address this issue because it is premature to categorically dismiss Plaintiffs' request for fees at

---

[117] *Cf. id.* at 91 ("[W]hether damages are direct or consequential is a question of law for the trial court. However, whether special circumstances exist to show that consequential damages were within the reasonable contemplation of the contracting parties is ordinarily a question of fact for the jury.").
[118] Compl. at 26.

33

this juncture given the possibility that later developments may justify a request for fees.[119]

## V.  CONCLUSION

For reasons set forth above, Defendants' Motion to Dismiss is denied.  An implementing order will be entered.

---

[119] *See Harpole Architects v. Barlow*, 668 F. Supp. 2d 68, 80 (D.D.C. 2009); *Burrell v. State Farm & Cas. Co.*, 226 F. Supp. 2d 427, 441 (S.D.N.Y. 2002); *Ill. Constr. Co. v. Morency & Assocs., Inc.*, 802 F. Supp. 185, 190 (N.D. Ill. 1992).